















CAG   2/2/06   8:46

3:05-CV-02266   RENTERIA V. KERNAN

*6*

*MEMSUP.*

# ORIGINAL

CHARLES R. KHOURY JR.
charlie.khoury@orchardview.net
Attorney at Law
Calif. State Bar  No. 42625
P.O. Box 1066
34 Orchard View Drive
Wilton N.H. 03086
603 654 2050 telephone
603 654 2567 fax

Attorney for Petitioner Alberto Renteria



FILED

JAN 3 1 2006

CLERK US DISTRICT COURT
SOUTHERN DISTRICT CALIFORNIA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALBERTO RENTERIA,<br><br>                 Petitioner,<br><br>         v.<br><br>SCOTT M. KERNAN      Respondent<br>        and<br><br>BILL LOCKYER, Attorney General<br><br>             Additional Respondent. | 05 CV 2266 DMS(BLM)<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS. |

COMES NOW petitioner ALBERTO RENTERIA,  and through his counsel, CHARLES R. KHOURY JR., files this  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE  PETITION FOR WRIT OF HABEAS CORPUS.

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES
### Preliminary Statement

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

After the state verdict finding ALBERTO RENTERIA and his co-defendant and co-federal habeas petitioner IVAN VASQUEZ [1] guilty of assault with a deadly weapon and enhancements , two jurors came forward and reported that the jury foreman had kept control and possession of the written jury instructions, refusing all but one juror access to the instructions and erroneously instructed them on the law regarding aiding and abetting. The foreman told the jurors that if Vasquez and Renteria were present at the scene of the crime and did not do anything to prevent it, they were guilty as aiders and abettors.   Both Vasquez and Renteria sought a new trial based on juror misconduct.   The trial court denied the new trial motion, finding that the erroneous statement of law by the juror foreman was simply his interpretation of the law, and therefore inadmissible under Evidence Code section 1150.   The court of appeal affirmed on the erroneous factual basis that the written jury instructions had in fact been available to the jurors and that the foreman was simply expressing an opinion on his interpretation of the law and that was inadmissible.

### ISSUES PRESENTED TO THIS FEDERAL COURT

21
22
23
24
25
26

Were the facts that the jury foreman told the jury that if petitioners were at the scene of the fight and did nothing to prevent the fight that they were guilty and then kept the jury instructions disagreeing with this statement from all but one of the jurors prejudicial jury misconduct under the decisional law of the Supreme Court of the United States?  Was the California Court of Appeal's

27
28

'05 CV2267 BEN(RBB); A related case Notice is being filed contemporaneously in this case with this memorandum of Points and Authorities.

- 2 -

1  mistake of fact that the jury instructions were **not** kept from any of the jurors a
2  reasonable interpretation  of the facts in view of the evidence presented?

3

4                          **STATEMENT OF THE CASE**

5        On August 20, 2002, Mr. Reneteria and co-petitioner, Ivan Vasquez, were
6  charged in a two-count amended information filed in the San Diego County
7  Superior Court. (CT 7.)  Count one of the information alleged that on or about
8  April 4, 2002, petitioners did unlawfully commit an assault upon Marco Iracheta
9  (Marco) with a deadly weapon and instrument of force likely to produce great
10 bodily injury in violation of section 245,subdivision (a)(1).  Count two alleged that
11 on or about April 4, 2002, petitioners assaulted Fernando Gamez (Gamez) with
12 a deadly weapon and instrument of force likely to produce great bodily injury in
13 violation of section 245, subdivision (a)(1). (CT 8.) The information alleged that
14 in the commission of the offenses, petitioners personally used a deadly weapon
15 within the meaning of section 1192.7, subdivision (c)(23), and committed the
16 offense for the benefit of, at the direction of, and in association with a criminal
17 street gang within the meaning of section 186.22, subdivision (b)(1).  (CT 8-9.)
18

19      The information further alleged that Mr. Renteria  was convicted of a prior
20 serious felony within the meaning of section 667, subdivision (a)(1), and was
21 convicted of a prior serious or violent felony within the meaning of section 667,
22 subdivisions (b) through (i) and section 1170.12,  (CT  10.)

23      Jury trial commenced on August 20, 2002.  (CT 177.)  On August 30,
24 2002, the court dismissed the personal use allegations against both petitioners
25 with respect to count two, the GAMEZ count.  (CT 13.)

26       On September 6, 2002, the jury found Mr. Renteria guilty on both counts,
27 found true the street gang allegations, but could not reach a decision on the
28 personal use allegations which were then dismissed as to both counts.  (CT421,
   RT1115,1124,1128.)   Mr. Renteria waived  his  right  to  a  trial  on  the  prior

                                   - 3 -

1   conviction allegations and admitted the priors.  (CT 421.)

2       On that same date of September 6, 2002, the jury found co-petitioner
3   Vasquez guilty on both counts and found true the personal use and street gang
4   allegations.  (CT 90 - 91.)

5       After the verdict but prior to sentencing, Juror No. 2 reported that during
6   deliberations, the jury foreman was a "control freak", wanted to read the
7   instructions to the jury, would not give the instructions to the jury, and told the
8   jury that because petitioners were at the scene of the crime and could have
9   stopped it but did not, they were guilty.  (CT 143.)  Juror No. 1 also reported the
10  foreman kept control of the jury instructions, read the "aiding and abetting"
11  instruction to the jury, and told them that if the petitioners were at the scene of
12  the crime and did not try to stop the attack, they were guilty.  (CT 146.)

13      On November 22, 2002, petitioners Vasquez and Renteria filed a Petition
14  for Release of Juror Names.  (CT 349.) (AUG[2] RT 22.)  The court deferred ruling
15  on the petition.  (CT 211.)  On December 16, 2002,petitioners  filed a Motion for
16  New Trial based in part on juror misconduct.  (CT 367.)  On December 20, 2002,
17  the court  tentatively granted the petition to release juror identification  and
18  began notifying jurors that a request had been made for information, allowing
19  them the opportunity to agree or oppose the request.  (CT 212; AUG RT 64.)

20

21      On February 21, 2003, the court denied the petition for disclosure of juror
22  information and denied the motion for new trial.  The court sentenced petitioner
23  RENTERIA to a total of 17 years and petitioner VASQUEZ to 19 years in state
24  prison.

25      Both petitioners RENTERIA and VASQUEZ   filed a timely notices of
26  appeal .

27      Mr. Renteria's conviction, along with that of co-defendant Vasquez, was

28

---

[2]"AUG" refers to the augmented reporters transcript filed September 17, 2003.

1  affirmed in a non-published opinion filed October 20, 2004 attached hereto as
2  **EXHIBIT "A".**

3  A petition for rehearing for both petitioners was denied on November 8,
4  2004.

5  A petition for review for both petitioners to the Supreme Court of California
6  was denied on February 2, 2005.

7

8  **STATEMENT OF FACTS**

9  **Prosecution Evidence**

10  On April 4, 2002, Gamez Marco and Marco's brother, Fernando, and a
11  female friend named Mona went to Golden Hills Park.  (RT 82 - 83, 162.)  They
12  sat at a picnic bench drinking alcohol and smoking marijuana.  (RT 83 - 84, 109,
13  137-138, 164.).   Gamez was affiliated with the "Sherman" gang.   (RT 85.)
14  Golden Hills Park is considered the territory of the "Lomas" gang.  (RT 86, 168.)
15  The Lomas and Sherman gangs are enemies.  (RT 169.)

16
17  A group of approximately five or six men and one woman with a
18  baby stroller approached.  (RT 86 - 87, 165, 259.)  One of the men asked where
19  Gamez' group was from.  (RT 88 - 89, 165, 260.)  Marco responded "Sherman."
20  The men said "get the fuck out of our park" and pulled out knives.  (RT 90 - 92,
21  166 - 167, 169, 262.)  One of the men was screaming "Lomas".  (RT 168.)  As
22  Gamez tried to get up from the bench he was stabbed in the back.  (RT 92.)
23  Gamez fell to the ground and was kicked in the head by three or four of the
24  men.  (RT 93, 95.)  Marco and Fernando ran off.  (RT 93, 106, 170.)

25  Two of the men came after Marco; one of them took a swing at him with
26  his fists, and the other took a stab at him with a knife, cutting Marco's sweater.
27  (RT 171 - 175, 186, 265, 424 )  According to Marco, the man taking a swing at
28  him with his fists wore glasses, and he later identified Mr. Vasquez as that man.
Marco identified Mr. Renteria as the man who took a stab at him with the knife.

- 5 -

1  (RT 172 - 173, 235, 238.428) According to Fernando however,   the man who
2  attacked Marco with a knife had a goatee and wore glasses and was not
3  Renteria. (RT 299, 489, 500.)

4        Marco and Fernando ran away from the men. (RT 174.) The men went
5  back to where Gamez was laying. (RT 290, 308.) Marco looked back and saw
6  Gamez being kicked and stepped on. (RT 178 - 179.) Eventually, the men
7  stopped and walked off. Mona helped Gamez get up and they ran to Marco and
8  Fernando. (RT 202.)

9        Oscar Rodriguez lived across from Golden Hills Park. (RT 154 - 15.) At
10 the time of the incident, Rodriguez saw Mr. Vasquez chasing a Hispanic man
11 with a knife. (RT 525, 533 - 534.) Rodriguez later saw Mr. Vasquez running
12 back to where another Hispanic man was laying on the ground and joined in
13 with the other Hispanic men beating up on the man. (Rt 526.)
14
15       At the hospital, Gamez was shown photos of both Renteria and Vasquez
16 and could not identify either one of them. (RT 101, 112.) Gamez did now know
17 who stabbed him. (RT 122, 126.)

18       Mr. Vasquez had the word "Lomas" tattooed on his arm. (RT 366.) In the
19 past, Mr. Renteria admitted to being a member of the Lomas gang. (RT 577 -
20 578, 590, 593, 602.) Lomas was a criminal street gang. (RT 694.)

21 **Defense Evidence**

22       Thomas R. MacSpeiden was a clinical psychologist and expert in
23 eyewitness identification. (RT 771, 775 - 776.) There were three stages to
24 eyewitness identification; acquisition, retention and retrieval. (RT 801.) Dr.
25 MacSpeiden studied what factors affected each of the stages. (RT 802.) Some
26 of those factors included the presence of a weapon, stress, distance, lighting,
27 consumption of alcohol and/or marijuana. (RT 802, 805, 811, 814 - 815, 856.)
28       Neither petitioner Renteria nor Vasquez testified.

- 6 -

**I**

**PETITIONER WAS DENIED HIS RIGHT TO DUE PROCESS AND JURY TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION DUE TO JUROR MISCONDUCT.**

**A. What the Juror Foreman Did in This Case Was an Overt Act of Juror Misconduct.**

The trial court in this case found the declarations set forth in footnote 4 at page 7 of the attached opinion (**Exhibit "A"**) to be inadmissible under section 1150 of the Evidence Code. The trial court was wrong in that section 1150 allows the court to consider evidence of overt acts of misconduct while preventing the court from delving into the juror's mental processes. (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.,* 234 Cal.App.3d 1724, 1745 (1991).) While a juror's erroneous statement of the law may be an overt act of juror misconduct, a juror's misunderstanding of the court's instruction, whether stated or unstated, involves the juror's subjective reasoning process. (*People v. Steele* 27 Cal.4th 1230, 1261 (2002).)

The court of appeal correctly pointed out the difference between *Steele, supra,* and *Stankewitz, supra* at page 9 of the opinion. *Steele* involved a misunderstanding of jury instructions which came about due to an improper statement by one juror. *Stankewitz* involved a police officer who used his police experience to influence other jurors erroneously about the law. Although the foreman here was not a police officer, that is a distinction without a difference. The opinion goes completely astray at this point at pages 10-11 where the court opined: "Nor was there any evidence that his [the foreman's] misunderstanding was obtained from a source extraneous to the judicial process. Instead, the declarations offered in support of the motion for new trial demonstrated merely that at one point in the deliberations the foreman stated the law as he misunderstood it based upon the instructions given by the trial court. (Fn.5) *It*

1  *is reasonable to assume that this misunderstanding was corrected by*
2  *reference to the copy of written instructions present in the jury room."*
3  (Emphasis added.)

4       It was not at all reasonable to make this assumption since the declarations
5  clearly state that the foreman improperly kept the jury instructions from all but
6  one juror. That act of keeping the jury instructions from the jurors, including the
7  two questioning jurors who wrote the declarations, was the overt act which
8  takes this case out of the simple misunderstanding category and puts it into the
9  category of an overt act of misconduct. That term "overt act" is defined as
10 "conditions, or events occurring, either within or without the jury room, of such
11 a character as is likely to have influenced the verdict improperly"[3] and are
12 therefore expressly allowed into evidence by section 1150.

13      The analysis of *Stankewitz* has been applied by appellate courts to allow
14 the admission of evidence of statements made during jury deliberations as overt
15 acts, including the following: a juror's affidavit describing the bailiff's remarks
16 concerning the amount of time available for deliberations (*People v. Hutchinson,*
17 71 Cal.2d 342, 351 (1969) ); a statement by one or more jurors that the jury
18 discussed defendant's failure to testify (*People v. Perez* 4 Cal.App.4th 893, 908
19 (1992) ); a juror's statement misinforming his fellow jurors that the defendant
20 was not negligent unless he was cited for a Vehicle Code violation (*Young v.*
21 *Brunicardi* 187 Cal.App.3d 1344, 1351 (1986)); the foreman's declaration stating
22 that he had advised the other jurors that an excessive award would be reduced
23 by the judge (*Dirosario v. Havens* 196 Cal.App.3d 1244, 1237-1238 (1987)); the
24 foreman's declaration that the jurors inappropriately discussed attorney's fees
25 and income taxes in awarding damages (*Trammell v. McDonnell Douglas Corp.*
26
27
28

---

[3] Section 1150 of the Evidence Code allowing admissibility of "statements made, or conduct , conditions, or events.....likely to have influenced the verdict improperly."

163 Cal.App.3d 157, 172.(1984))

The appellate courts deciding the above cases ruled the evidence to be admissible.  The instant argument for admissibility of the declarations is much stronger than any of those cases where there was never such an egregious act by a juror as occurred here, the foreman preventing the jurors from seeing the jury instructions and then telling the jurors the wrong law which could not be checked against the jury instructions.

The appellate opinion in this case, at page 11, relied on *People v. Elkins* (1981) 123 Cal.App.3d 632, 638 to conclude that the foreman's erroneous statement that Renteria and Vasquez were guilty if they did nothing to stop the fracas in the park reflected his subjective mental processes; verbalizing those erroneous thoughts to the other jurors did not take them out of the realm of inadmissible evidence. As stated above, however, the court totally disregarded the fact the foreman did not just voice an erroneous understanding of the law,  he practically **insured** the other jurors would agree with him by refusing to give them the jury instructions.

After complaints from the jurors he *finally* let juror no. 7 see the jury instructions. (Slip opinion at fn. 4.)  Giving  them to one juror was not enough to erase the misconduct of the foreman. This refusal to share the jury instructions coupled with his  erroneous statement of what the instructions contained as to the issue of **presence** in the park was an overt act of misconduct,  piercing the protective veil of section 1150 of the Evidence Code.

**B. Juror Misconduct Unconstitutionally   Destroyed The Structural Integrity of The Trial.**

"An accused has a constitutional right to a trial by impartial jury.  (U.S. Const., Amends. VI and XIV; Cal. Const., art. I, section 16..." An impartial jury is one in which no member has been improperly influenced [citations] and every member is 'capable and willing to decide the case solely on the evidence before it.'  (*In Re Hamilton* (1999) 20 Cal.4th 273, 293 - 294.) Defendant is 'entitled to be tried by twelve, not eleven, impartial and

unprejudiced jurors. 'Because a defendant charged with [a] crime has a right to the unanimous verdict of twelve impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced.' (*People v. Holloway*, 50 Cal.3d 1098, 1112,(1990) disapproved on other grounds in *People v. Standsbury* 9 Cal.4th 824, 830, fn. 1 (1995)

Prejudicial jury misconduct undermines the structural  integrity of a trial and therefore is not  amenable to the ordinary harmless error standard of review.  (*People v. Nesler,* 16 Cal.4th 561, 579 (1997).) ["A biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard."].

The misconduct occurred here when the jury foreman a) withheld the written jury instructions from the jury and b) then gave an erroneous statement of law to the jury that the petitioners were guilty if they were simply in the park where the assaults and stabbing  took place and made no attempt to stop the assaults.

There can be little doubt that a foreman's withholding the written jury instructions from the jury, giving his own erroneous definition of aiding and abetting being mere presence where the crime is being committed, and stating that failure to stop the assault shows guilt, is committing misconduct.

The   jury misconduct which occurred here undermined the structural integrity of this trial and, therefore, the harmless error standard review cannot be applied.

**C. The Presumption of Prejudice Due to Juror Misconduct  Was Not Rebutted**.

It is well established that juror misconduct raises a presumption of prejudice.   *In re Hamilton, supra,* 20 Cal.4th 273, 295. This presumption of prejudice is, in part, a response to the statutory prohibition against impeaching a verdict with declarations  or statements of a juror's subjective mental processes, e.g., with a juror's statement whether he or she was biased against the defendant. (*id.*)

In the instant case, the facts are that  foreman of the jury kept the jury instructions from the jurors and then gave  erroneous statements of law to the jurors to influence them in their deliberations.  The misconduct of the foreman becomes even more prejudicial when viewed in light of the record as a whole. This was a close case with contradictory descriptions of both petitioners from the witnesses.  It all came down to the fact that both petitioners were obviously there at the scene, and that is why the foreman's words to the jury that being in the park and not stopping the fracas  was enough to show guilt and the withholding of the correct juror instruction from the jury is fatally prejudicial.

> 'The presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct of a type likely to have had an affect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred "due to" ' the substantial barrier to prove a prejudice which Evidence Code section 1150 erects. [Barring impeachment of a verdict by evidence of a juror's subjective mental processes.].' The presumption of prejudice, 'seeks to lower that barrier somewhat.'" (*People v. Holloway*, *supra*, 50 Cal.3d 1098, 1109.)

## D. The Trial Judge Misapplied Section 1150 Of The Evidence Code.

The trial judge never allowed the presumption of prejudice to work in this case. To the contrary, he allowed section 1150 to cut out erroneously the jury foreman's  statements to the jurors that if the defendants were in the park, they were guilty.   This is exactly what the presumption of prejudice was to prevent, the operation of section 1150 to block a defendant from showing juror misconduct. That improper application of section 1150 by the trial judge served to deprive appellant of Due Process and a fair jury trial under the 6th and 14th Amendments to the U.S. Constitution.

The U.S. Supreme Court has consistently held that domestic rules of evidence may not be invoked to preclude a criminal defendant from establishing that he has been denied a fair trial. (See *Rock v. Arkansas* (1987) 483 US 44 ; *Green v. Georgia* (1979) 442 US 95 ; *Davis v. Alaska* (1974) 415 US 308 ;

- 11 -

1 | *Chambers v. Mississippi* (1973) 410 US 284 ; *Washington v. Texas* (1967) 388
2 | US 14 .)

3 |      Domestic rules of evidence, specifically section 1150 of the Evidence
4 | Code,  plus their misapplication by the California Court of Appeal have done
5 | just that in this case.

6 |      The AEDPA is no bar to the granting of this petition as is discussed below.

7 |
8 |
9 |                                        II

10 | **SINCE THE COURT OF APPEAL DECISION  WAS BASED ON
11 | AN UNREASONABLE DETERMINATION OF THE FACTS, THAT
   | DECISION IS NOT ENTITLED TO DEFERENCE BY THIS
12 | FEDERAL COURT. SINCE  THE STATE COURT DECISION
   | ALSO INVOLVED AN UNREASONABLE APPLICATION OF
13 | CLEARLY ESTABLISHED FEDERAL LAW, THE AEDPA IS NO
   | BAR TO THE GRANTING OF THIS PETITION.**

14 | **A. THE PETITION SHOULD BE GRANTED UNDER THE AEDPA. .**
15 | The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C.
16 | section 2254, defines the standard of review in this case.

17 |      An application for a writ of habeas corpus on behalf of a person in
18 | custody pursuant to a judgement of State court shall not be granted
   | with respect to any claim that was adjudicated on the merits in State
19 | court proceedings unless the adjudication of the claim–
   | (1) resulted in a decision that was contrary to, or involved an
20 | unreasonable application of, clearly established federal law, as
   | determined by the Supreme Court of the United States; or
21 |
22 |      (2) resulted in a decision that was based on an unreasonable
23 | determination of the facts in light of the evidence presented in the
   | State Court proceeding.

24 | 28 U. S. C. section 2254(d)(1)
25 |
26 |
27 |      In *Taylor v. Maddox,* 366 F.3d 992,999  (9th Cir. 2004), the Ninth Circuit
28 | established a two part analysis under sections 2254(d)(2) and (e)(1). Under
   | *Maddox,* federal courts must undertake an "intrinsic review" of the state court's

- 12 -

1 fact finding under the "unreasonable determination" clause of section 2254(d)(2)

2 (*Maddox* at p.1000.)

3 The *Maddox* court held that this intrinsic review requires federal courts to

4 examine the fact-finding *process* not its findings. That court went on to state that

5 "intrinsic challenges to state court findings pursuant to the 'unreasonable

6 determination' standard comes in several flavors, each presenting its own

7 peculiar set of considerations." The court listed, for example " where the state

8 court should have made a finding of fact but neglected to do so.[;]...where the

9 state court does make factual findings , but does so under a misapprehension

10 as to the correct legal standard [;]...and, where the fact finding process is itself

11 defective" . (Maddox, supra, at 1000-01.) "Once the state court's fact-finding

12 process survives this intrinsic review-or in those cases where petitioner does

13 not raise a challenge to the intrinsic facts as found by the state court-the state

14 court's findings are dressed in a presumption of correctness," (28 U.S.C. 2254

15 (e)(1); *Maddox . supra,* at p. 1000.)

16

17

18 **B.   The State Appellate Opinion Upholding A Conviction In the Face of**
**Clear Juror Misconduct Was Based Both on Unreasonable Application**
19 **Of, Clearly Established Federal Law, as Determined by the Supreme Court**
**of the United States And On an Unreasonable Determination of the Facts.**

20 1. **Applicable Law of the Supreme Court of the United States**

21      The United States Supreme Court  has repeatedly insisted in a wide

22 variety of contexts that the right to be tried before a jury capable and willing to

23 decide a case solely on the evidence before it is a cornerstone of our   criminal

24 justice system. See, e. g., *Irvin v. Dowd*, 366 U.S. 717 (1961). This precious

25 right is denigrated when a conviction resting upon deliberations tainted by a

26 juror's  impropriety, such as occurring here by the foreman,  is allowed to stand.

27      In *Irwin v. Dowd, supra,* the Supreme Court of the United States set forth

28 the following at pp. 721-722:

England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. This right has become as much American as it was once the most English. Although this Court has said that the Fourteenth Amendment does not demand the use of jury trials in a State's criminal procedure, *Fay v. New York,* 332 U.S. 261; *Palko v. Connecticut,* 302 U.S. 319, every State has constitutionally provided trial by jury. See Columbia University Legislative Drafting Research Fund, Index Digest of State Constitutions, 578-579 (1959). In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver,* 333 U.S. 257; *Tumey v. Ohio,* 273 U.S. 510. "A fair trial in a fair tribunal is a basic requirement of due process. " *In re Murchison,* 349 U.S. 133, 136. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. *Thompson v. City of Louisville,* 362 U.S. 199. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies

As has already been set forth above, The U.S. Supreme Court   has consistently held that domestic rules of evidence may not be invoked to preclude a criminal defendant from establishing that he has been denied a fair trial.  (See Supreme Court cases cited in argument  I above.)


**2. The Facts Set Forth In the Court of Appeal Opinion That the Correct Law, In the Form of Jury Instructions, Was Available To The Jury Despite What The Foreman Told Tat Jury,   Was An Unreasonable Determination Of The Facts In Light Of The Evidence Presented At Trial.**

The state court's fact-finding process in this case suffered from the same infirmities that the Ninth Circuit identified in *Taylor v. Maddox, supra* where the state court's "failure to consider, or even acknowledge . . . highly probative testimony cast serious doubt on the state-court fact-finding process and compelled the conclusion that the state-court decisions were based on an unreasonable determination of the facts." 366 F.3d 992, 1005 (9th Cir.), cert. denied, 125 S. Ct. 809 (2004).

1    In *Taylor*,  the state court failed to consider a witness's probative and
2   corroborating testimony that the petitioner, a minor, had repeatedly asked to
3   speak with a lawyer and with his mother after being arrested in the middle of the
4   night and interrogated without break until three o'clock in the morning. Whereas
5   the minor's testimony was "clear, direct, consistent, and unequivocal," *id.* at
6   1013, the conflicting testimony of the officer was "ambiguous," *id.* at 1010-12,
7   "inherently incomplete and somewhat confused," id. at 1013.

8    Analogous circumstances exist in this case. The Court of Appeal opinion
9   at footnote 5 states with respect  to the misstatement of law of the foreman:
10  (Fn.5) ***It is reasonable to assume   that this misunderstanding was***
11  ***corrected by reference to the copy of written instructions present in the***
12  ***jury room.***"  This of course is not at all reasonable to assume since the two
13  juror declarations stated unequivocally that the foreman was such a "control
14  freak" he refused to share the jury instructions except with one other juror.
15

16   In a petition for rehearing, both petitioners pointed out this factual error to
17  the court of appeal but the petitions for rehearing were denied nonetheless.

18   Accordingly,  "the fact-finding process is itself defective" under *Maddox,*
19  *supra.*

20  **3. The Petition Must Be Granted Under These Circumstances.**

21   As is set forth above, the structural integrity of both petitioners' trial  was
22  compromised by the misconduct of the jury foreman.   Granting the writ
23  and reversal should occur without reference to harmless error.

24   At a minimum, if a habeas court is left with 'grave doubt' about whether a
25  constitutional error substantially influenced the verdict, then the error was not
26  harmless." *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004) (citing *O'Neal*
27  *v. McAninch*, 513 U.S. 432, 438, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995). It is
28  submitted that grave doubt as to the fairness of the trial of both petitioners has
    to exist in the mind of any jurist. The petitions should be granted.

- 15 -

1
2
3
4          **CONCLUSION**
5
6      This Petitions for Writ of Habeas Corpus  should be granted and result in
7   a reversal and   retrial due to juror misconduct.
8
9              Respectfully submitted,
10
11
12
13              Charles R. Khoury Jr.
14      Attorney for Petitioners Renteria and Vasquez
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

2004 Cal. App. Unpub. LEXIS 9529, *

THE PEOPLE, Plaintiff and Respondent, v. IVAN VASQUEZ et al., Defendants and Appellants.

D041726

COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE

2004 Cal. App. Unpub. LEXIS 9529

October 20, 2004, Filed

NOTICE:   [*1]  NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBIT COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

PRIOR HISTORY:   APPEALS from judgments of the Superior Court of San Diego County, No. SCD166690. David M. Gill, Judge.

DISPOSITION: Affirmed.

CORE TERMS: juror, foreman, gang, deliberations, misunderstanding, misconduct, police officer, park, attackers, deadly weapon, spoke, juror misconduct, declaration, new trial, midterm, stab, force likely, inadmissible, assault, prison, personally used, jury room, enhancement, abetting, attacked, sentence, stabbed, alley, woman, cause great bodily injury

JUDGES: IRION, J.; O'ROURKE, Acting P. J., AARON, J. Concurred.

OPINIONBY: IRION

1

OPINION: Appellants Ivan Vasquez and Alberto A. Renteria appeal from judgments sentencing them to prison for terms, respectively, of 19 years and 17 years, imposed after a jury found each of them guilty of two counts of assault with a deadly weapon or with force likely to cause great bodily injury, in violation of Penal Code section 245, subdivision (a)(1). n1 They contend the judgments must be reversed due to juror misconduct. Renteria also contends there is no substantial evidence in support of the jury's verdicts finding him guilty of the assaults. For reasons explained in this opinion, we affirm the judgments.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 All further statutory references are to the Penal Code unless otherwise specified.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*2]

I

## FACTUAL AND PROCEDURAL SUMMARY

On the afternoon of April 4, 2002, five to seven members of the Lomas Street gang attacked three young men in Golden Hills Park after one of them identified himself as a member of the Sherman gang, a rival group. Victim Fernando G. n2 was stabbed in the back, kicked and stomped upon by three or four of the attackers. One of the attackers attempted to stab victim Marco I., and another tried to hit Marco with balled fists, but he was uninjured. Marco's brother Fernando I. managed to run away.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The record does not reveal the ages of the victims, but the information identified them by the initial of their last names, suggesting they may have been minors at the time of the crimes. We continue to use this form of

reference to protect their privacy.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Vasquez and Renteria were charged with assault with a deadly weapon and instrument of force likely to produce great bodily injury in violation of section 245, subdivision (a)(1) against Marco in count 1 and against Fernando G. [*3] in count 2. Both Vasquez and Renteria were alleged to have personally used a deadly weapon ( § 1192.7, subd. (c)(23)). Both were also alleged to have committed the offense for the benefit of, at the direction of, and in association with a criminal street gang ( § 186.22, subd. (b)(1)). The information also alleged that Vasquez had previously been convicted of attempted murder, a prior conviction within the meaning of sections 667.5, subdivision (b), 668, 667, subdivision (a)(1), 1192.7, subdivision (c), 667, subdivisions (b) through (i), and 1170.12. Finally, the information alleged that Renteria had previously been convicted of robbery within the meaning of sections 667, subdivision (a)(1), 668, 1192.7, subdivision (c), 667, subdivisions (b) through (i), and section 1170.12.

The defense was that the prosecution evidence was not sufficient to prove Vasquez and Renteria were part of the group that attacked the victims. The identification evidence was conflicting. Fernando G. was unable to identify either defendant from photos shown to him by the police. At trial, he identified Vasquez and Renteria as being among those who attacked him. He testified that neither Vasquez nor Renteria [*4] was the person who stabbed him, although either could have been the stabber. He testified that he identified Vasquez and Renteria because of the photos shown to him by police. He was relying on the police to arrest the right people. The defense and the prosecution stipulated that Fernando G. told personnel at Mercy Hospital that he had used marijuana laced with cocaine on the day of the crimes.

Marco testified that all of the attackers were armed with knives. He identified Renteria on the day of the crime and in court as the person who took a stab at him. He told police that the person who tried to hit him with a balled-up fist was wearing a blue T-shirt and glasses. Vasquez was wearing a blue shirt at

3

the time of his arrest. He wore glasses in court. Marco testified that when he spoke with an investigator, he deliberately switched the identifications around. At trial he was firm in his conviction that he could identify his attackers.

Fernando I. testified that most of the attackers were armed with knives. He identified Vasquez on the day of the crime as one of the attackers. He did not identify Renteria on the day of the crime, and could not identify either Vasquez or Renteria in [*5]  court.

Oscar Rodriguez, who lives across the street from Golden Hills Park, saw the fight from his house. On the day of the crime, he identified Vasquez as the person who ran past his apartment with a knife in his hand after the attack. He did not identify Renteria on the day of the crime. At trial he was a reluctant witness, claiming not to remember anything about the incident. Rodriguez claimed he was intoxicated when he spoke with police and could not remember anything he said to the police. n3 He did not identify Vasquez or Renteria at trial.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Detective Ray Valentin, who spoke with Rodriguez, detected no symptom of intoxication. He testified at trial that it did not appear Rodriquez had had anything to drink.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

A woman who lived in the neighborhood, Angeles Villegas, was walking though an alley, pushing her child's stroller on her way home from the laundromat on the day of the attack, when Renteria ran toward her. When he saw the police coming, he said, "I'm with you. I'm with you." She said, "No, you're [*6]  not." Police Officer Michael Wintz saw Renteria run into the alley and speak with the woman. He detained Renteria for possible identification, and arrested him when he was identified by Marco.

4

As Police Officer Erroll McCrea was en route to the scene, he saw Vasquez walking swiftly and breathing heavily. When detained, Vasquez was nervous and initially gave police a false name. After the police were unable to find anyone by that name in their system, he said his name was Ivan Vasquez. McCrea noticed Vasquez had a Lomas tattoo on his arm.

Several police officers testified that Vasquez and Renteria were known members of the Lomas Street gang. Detective Greg Pinarelli, who testified as an gang expert for the prosecution, testified that Renteria and Vasquez are among the 42 members of the Lomas Street gang. He opined that the crime committed in this case benefited the Lomas Street gang by enhancing its reputation for violence with other gangs and in the community.

Thomas R. MacSpeiden, Ph.D., called by the defense, testified concerning the factors that affect the accuracy or inaccuracy of eyewitness identification.

After both sides rested, the court granted defense motions for judgment [*7] of acquittal ( § 1118.1) as to the allegations that Vasquez and Renteria personally used a deadly weapon against victim Fernando G.

The jury found Vasquez and Renteria guilty of assault with a deadly weapon or with force likely to cause great bodily injury as charged in counts 1 and 2. It also found that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The jury was unable to reach a verdict on the allegation that Renteria personally used a deadly or dangerous weapon against Marco as alleged in count 1. Therefore, the court declared a mistrial as to that matter, and the prosecutor's motion to dismiss the allegation was granted.

Vasquez admitted that he was convicted of attempted murder in June 1997, that he served a separate prison term for that conviction within the past five years, and that the crime was a serious felony within the meaning of the Three Strikes law. Renteria admitted that he was convicted of robbery in January 1998 within the meaning of the Three Strikes law.

5

The court sentenced Vasquez to prison for a term of 19 years, consisting of a midterm [*8] (three years) doubled, plus two 5-year enhancements ( §§ 186.22, subd.(b)(1), 667 subd. (a)(1))·on count 1, and a consecutive two-year sentence (one-third the midterm) plus a one-year enhancement ( § 186.22, subd. (b)(1)) on count 2.

The court sentenced Renteria to prison for a term of 17 years, consisting of a midterm (three years) doubled, plus one 3-year enhancement ( § 186.22, subd.(b)(1)) plus one 5-year enhancement ( § 667, subd. (a)(1)) on count 1, and a consecutive two-year sentence (one-third the midterm) plus a one-year enhancement ( § 186.22, subd. (b)(1)) on count 2.

II

THE NEW TRIAL MOTION BASED ON JUROR MISCONDUCT

Vasquez and Renteria moved for a new trial on the ground of juror misconduct. Their motions were supported by the written statements of two jurors who declared, in relevant part, that during deliberations the foreman said that if Vasquez and Renteria were at the park and did not try to stop the attack, they were guilty. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Juror No. 2 declared, under penalty of perjury: "1. I was Juror Number 2 in the trial of Ivan Vasquez and Alberto Renteria. [P] 2. I did not believe there was any evidence that either defendant committed the act of stabbing anyone in the park. The jury felt that the defendants were at the park. [P] 3. The Presiding Juror, Number 5, was a control freak. He wanted to read the instructions to us. He would not give the jury instructions to us to read. He said that they were there and they could have stopped the incident and did not therefore they were guilty. He even controlled the buttons for the bailiff. [P] [4]. The Presiding Juror was rude to Juror Number 7. Juror Number 7 finally put her foot down and got the instructions. Juror Number 7 was the Indian woman in the front row. [P] [5]. There seemed to be an overall attitude that because they were in a gang they were guilty. [P] [6]. The trial

6

went long and the Jurors were in a hurry. There was some pressure to reach a verdict. We called for a readback and we cancelled it because it would take too much time. [P] [7]. We should not have settled any of it. I feel they are not guilty and feel I should have stood my ground. I felt like we had done the wrong thing immediately. I stayed with Juror Number 1 and spoke to some people from Mr. Cox's office and told them about the lack of evidence at that time. [P] [8]. I was convinced to find them guilty even though there was no evidence they had done anything because they were there and did not stop it. This is what Juror Number 5 declared the law to be."

Juror No. 1 declared under penalty of perjury: "1. I was Juror Number 1 in the trial of Vasquez and Renteria, SCD 166690. [P] 2. I felt that there was no credible evidence that either of these defendants were guilty of stabbing [Fernando G., known as] Giant or Fernandez [sic]. [P] 3. I believe they were there, however, in all the testimonies that were presented, no one could identify Vasquez nor Renteria as one of the guys who stabbed Giant. In my opinion the Fernandez [sic] brothers were lying on the stand so I could not figure out who actually took a stab at him (one of the Fernandez [sic] brothers) so I ignored there [sic] testimonies. [P] 4. When I heard [prosecutor] Mr. Runyon's closing argument about aiding and abetting and that if these men were there they were guilty according to the law. [P] 5. I believed Renteria was at the park because of the girl with the baby carriage. I believed Vasquez was at the park because of the witness across the street. I believe that his in court testimony was explainable because he was scared. [P] 6. During the deliberations the foreman kept control of the jury instructions and read them to us. He read the Aiding and Abetting instruction to us. He said that if they were at the park and did not try to stop the attack, they were guilty. He finally allowed Juror Number 7 to read the instructions. [P] 7. After the trial two other Jurors and I returned to the jury lobby and spoke to another juror that had many trials under her belt. We were upset by what had just happened and explained that we did not think they had done anything but the law said we had to convict. She said that the reason they need juries was in cases like this. That is if it did not seem right the jury could acquit. Since then I have been upset with what we did."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*9]

The trial court ruled this evidence inadmissible under Evidence Code section 1150, and denied the motion for new trial without taking evidence. Vasquez and Renteria contend the court erred in denying the new trial motion. Vasquez argues the jurors' declarations should have been considered because they described overt acts of misconduct rather than the reasoning process by which the foreman reached his conclusion. Renteria joins in this argument and adds that the misconduct undermined the structural integrity of the trial.

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Cases involving the statement of a juror during [*10]  deliberations require a careful application of the rule of Evidence Code section 1150. If the statement injects into the deliberations evidence or law obtained from a source other than in court, the statement is an admissible overt act of misconduct. (See, e.g., In re Stankewitz (1985) 40 Cal.3d 391, 220 Cal. Rptr. 382 [juror made misstatement of law based on his experience as a police officer]; People v. Honeycutt (1977) 20 Cal.3d 150, 141 Cal. Rptr. 698 [juror consulted attorney re questions of law involved in the case].) If, on the other hand, the juror's statement reflects his or her deliberative process based upon the law as instructed by the court and evidence received in court, the statement is not admissible to impeach the verdict. (See Mesecher v. County of San Diego (1992) 9 Cal.App.4th 1677 [jurors' misdefinition of battery was deliberative error in the collective mental process].) This distinction implements the policy favoring the "'free exchange of ideas during the jury's deliberations.'" (People v. Cox (1991) 53 Cal.3d 618, 700, 280 Cal. Rptr. 692, citing People v. Elkins (1981) 123 Cal. App. 3d 632, 638, 176 Cal. Rptr. 729.) [*11]

One example of the distinction is found in People v. Steele (2002) 27

8

Cal.4th 1230, where the California Supreme Court held that Evidence Code section 1150 renders inadmissible the declaration of jurors that they would not have voted for the death penalty had they believed the court's instruction concerning life without the possibility of parole. The Steele court explained: "'Evidence that the jurors misunderstood the judge's instructions, were influenced by an improper remark of a fellow juror, assented under an erroneous belief that the judge would use clemency or had the legal right to vary the sentence, or had been influenced by inadmissible evidence is simply of no legal significance. [Citation.] In short, under both the common law and Evidence Code section 1150, the jurors' motives, beliefs, misunderstandings, intentions, and the like are immaterial.'" (Id. at p. 1264.)

An opposite example is found in In re Stankewitz, supra, 40 Cal.3d 391. There, two jurors declared that another of the jurors "advised the other jurors that he had been a police officer for over 20 years; [*12] that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint . . . he committed robbery, whether or not he intended to keep them." (Id. at p. 396.) The California Supreme Court reversed the judgment, explaining in relevant part: "When extraneous law enters a jury room - i.e., a statement of law not given to the jury in the instructions of the court - the defendant is denied his constitutional right to a fair trial unless the People can prove that no actual prejudice resulted." (Id. at p. 397.) The juror "violated the court's instructions and 'consulted' his own outside experience as a police officer on a question of law. Worse, the legal advice he gave himself was totally wrong. Had he merely kept his erroneous advice to himself, his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict. But he did not keep his erroneous advice to himself; rather, vouching for its correctness on the strength of his long [*13] service as a police officer, he stated it again and again to his fellow jurors and thus committed overt misconduct." (Id. at pp. 399-400.)

Here, as in Stankewitz, the juror did not keep his misunderstanding of the law to himself. And here, as in People v. Honeycutt, supra, 20 Cal.3d 150, 158, the misunderstanding of the law was that of the foreman, "whose

perceptions and conclusions may often sway other jurors." But there is no indication that the foreman's misunderstanding of the law was based upon his own experience or expertise. Nor was there any evidence that his misunderstanding was obtained from an source extraneous to the judicial process. Instead, the declarations offered in support of the motion for new trial demonstrated merely that at one point in the deliberations the foreman stated the law as he misunderstood it based upon the instructions given by the trial court. n5 It is reasonable to assume that this misunderstanding was corrected by reference to the copy of written instructions present in the jury room. In other words, the statement attributed to the foreman reflected his subjective mental processes during deliberations. [*14] The subjective nature of that process is not changed simply because other jurors heard, remembered and reported the foreman's verbalization of his reasoning. (People v. Elkins, supra, 123 Cal. App. 3d 632, 638.) As this court observed in Mesecher v. County of San Diego, supra, 9 Cal.App.4th at page 1684: "Here, the juror's statements themselves did not constitute misconduct, nor do they reflect an outside influence brought into the courtroom. Rather, the alleged misconduct arose from the way in which the jury interpreted and applied the instructions. Such evidence is inadmissible."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 We note that the trial court instructed the jury that: "Mere presence does not amount to aiding and abetting. And mere knowledge that a crime is being committed and the failure to prevent the commission of that crime does not by itself amount to aiding and abetting."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Accordingly, we hold the trial court did not err in refusing to consider the declarations of Juror No. 1 and Juror No. 2 in ruling [*15] on the motion for new trial. It necessarily follows that the order denying the motion on the ground that no juror misconduct had been proved was proper. In light of this conclusion, we need not reach Renteria's contention that juror misconduct undermined the structural integrity of the trial.

III

THE SUFFICIENCY OF THE EVIDENCE

Renteria contends the evidence was insufficient to prove he assaulted either Fernando G. or Marco. He asserts that he was found guilty only because of the foreman's misconduct, as demonstrated by the fact that the jury was unable to agree that he was the person who attempted to stab Marco.

We review this contention under the substantial evidence rule, resolving issues of credibility and drawing all reasonable inferences in support of the jury's verdicts. (People v. Solís (2001) 90 Cal.App.4th 1002, 1011.) So viewed, the evidence we have previously summarized proved that Renteria, who was identified by Marco as a participant in the attack, and who attempted to avoid contact with the police by claiming he was with Villegas as she pushed her child's stroller through an alley, participated in the attacks on the victims for the purpose [*16] of enhancing his gang's reputation for violence. This evidence is sufficient to support the jury's implied findings that Renteria aided and abetted the assaults on Fernando G. and Marco.

DISPOSITION

For the foregoing reasons, the judgments are affirmed.

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

AARON, J.

11

1 | **CHARLES R. KHOURY JR.**
**charlie.khoury@orchardview.net**
2 | **Attorney at Law**
**Calif. State Bar No. 42625**
3 | **P.O. Box 1066**
**34 Orchard View Drive**
4 | **Wilton N.H. 03086**
**603 654 2050 telephone**
5 | **603 654 2567 fax**

6 | **Attorney for Petitioner RENTERIA**

7

8 |            IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF CALIFORNIA
9

10

11 | _____          05cv2266DMS(BLM)

12 | ALBERTO RENTERIA ,            )

13 |                Petitioner,   )

14 |                              )

15 |            v.                ) DECLARATION OF SERVICE

16 | SCOTT KERNAN, Warden          )

                Respondent.   )
17

I. The undersigned, say: I am a citizen of the United States, over 18

18 years of age, employed in HILLSBOROUGH , NEW HAMPSHIRE, where

19 the mailing occurred and an not a party to the subject cause, My business

20 address is P.O. BOX 1066, 34 Orchard View Drive,  WILTON , NEW

21 HAMPSHIRE.  I served one copy of  ATTACHED MEMORANDUM OF

22 POINTS AND AUTHORITIES  with proper postage addressed to:

23 | ATTORNEY GENERAL                ALBERTO RENTERIA
OF THE STATE OF CALIFORNIA       T-83477
24 | P.O. BOX 85266                   CSP/SAC B-8-119
SAN DIEGO CALIF. 92186-5266      P.O. BOX 290066
25 |                                  REPRESA CA. 95671

26 I declare under penalty of perjury under the laws of the state of California the
above facts are true.

27 CHARLES R. KHOURY JR.            JANUARY 30, 2006

28